### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| DONALD W. MORRIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:15-cv-00193-TWP-TAB |
| | ) |
| CAROLYN W. COLVIN, Acting Commissioner | ) |
| of the Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

### ENTRY ON JUDICIAL REVIEW

Plaintiff Donald W. Morris ("Morris") requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). For the following reasons, the Court **AFFIRMS** the decision of the Commissioner.

## I.      BACKGROUND

**A.      Procedural History**

On January 27, 2012, Morris protectively filed an application for SSI, alleging a disability onset date of January 10, 2012, due to degenerative disc disease, depression, and substance abuse. His claim was initially denied on April 24, 2012, and again on reconsideration on July 11, 2012. Morris filed a written request for a hearing on August 7, 2013, thereafter, a hearing was held before Administrative Law Judge Monica LaPolt (the "ALJ").  An impartial vocational expert appeared and testified at the hearing and Morris was represented by counsel.   On August 30, 2013, the ALJ denied Morris's application for SSI.  Following the denial, Morris requested review by the Appeals Council.  On December 17, 2014, the Appeals Council denied his request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner for purposes

of judicial review.  On February 10, 2015, Morris filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**B.** **Factual Background**

At the time of his alleged disability onset date, Morris was 32 years old, and he was 34 years old at the time of the ALJ's decision.  Morris completed his high school education and has an employment history of working as a stocker and laborer.

Morris sought treatment for pain as early as January 2011 when he presented to the Wishard Memorial Hospital ("Wishard") emergency room with complaints of back pain.  He was discharged with a prescription for a narcotic painkiller.  Approximately two months later, on March 16, 2011, Morris again presented to Wishard's emergency room for back pain.  He was counseled to seek physical therapy to help his back, was again prescribed a narcotic painkiller, and discharged.

Less than a week later, on March 21, 2011, Morris again presented to the emergency room because of his back pain.  The emergency room progress note explains that Morris had fallen off a roof and landed in a dumpster about two months earlier.  His lower back pain was inconsistently radiating down into his left leg; however, the note records that he had no numbness or tingling. On physical examination, it was noted that Morris displayed a very flat-footed gait with a marked inward arch rotation.  His back pain was easily reproduced with pressure put on his back. However, he was able to heel/toe walk without an increase in pain, and he retained full strength. He was counseled to seek treatment from a primary care physician and again counseled to seek physical therapy.  He was diagnosed with sacroiliitis (inflammation of the sacroiliac joint where the lower spine and pelvis connect) and again prescribed a narcotic painkiller as well as encouraged to use ibuprofen.

Morris returned to the emergency room eight days later on March 29, 2011.  He again complained of lower back pain with inconsistent radiating pain in his left leg.  He had no numbness or tingling.  Morris reported that he had a physical therapy appointment scheduled the following week.  Again, he was discharged and prescribed a narcotic painkiller and also ibuprofen.

Five days later, Morris returned to the emergency room on April 3, 2011, this time after he smashed his hand in a door.  There was no bone, joint, or tissue damage.  He was discharged with a prescription for a narcotic painkiller and ibuprofen.  Throughout the rest of April, May, and June, Morris returned to the emergency room numerous times, complaining of back pain and other complaints.  Each time, he was discharged with a prescription for a narcotic painkiller or a narcotic-like painkiller.  He often was directed to see a primary care physician to receive treatment for pain management.  During his June 13, 2011 emergency room visit, Morris was instructed that he would not receive any more narcotics from the emergency room until he met with a primary care physician.

On July 3, 2011, Morris again presented to the emergency room.  He complained of back pain and tooth pain.  He explained that he had an appointment scheduled in about a month with a primary care physician and planned to have his teeth pulled and dentures placed in about ten days.  Morris was counseled regarding receiving dental treatment and was discharged with a prescription for pain medication, but not a narcotic.  He returned to the emergency room four days later, on July 7, 2011, complaining of back and tooth pain.  He again explained that he had an appointment scheduled with a primary care physician and planned to have his teeth pulled.  He was discharged and directed to immediately go to a dental clinic.  He also was given a prescription for a small amount of narcotic painkillers.  At another emergency room visit on July 23, 2011, Morris

complained of back, tooth, and ear pain and was discharged with a prescription for a narcotic painkiller, ibuprofen, and an antibiotic.

On August 1, 2011, Morris presented to a primary care clinic.  He complained of back pain, tooth pain, depression, and anxiety.  He explained that his six to seven month history of back pain followed an accident falling off a roof.  He also complained of shooting pain down into his leg. Morris noted that he had been seen several times during the year in the emergency room because of pain.  He reported not being able to sit or stand for long periods of time and not being able to lie flat on his back.  The doctor reviewed a CT scan of Morris's head and neck and noted that they looked fine.  It was noted that no imaging had been taken of Morris's lower back.  On physical examination, it was noted that Morris had decreased range of motion in the lower left extremity and pain on palpation.  Morris continued representing that he would see a dentist in the next ten days.  He denied any illicit drug use.  The doctor scheduled a return appointment for Morris in the primary care clinic, referred him to Midtown Community Mental Health Center ("Midtown") for his depression and anxiety, suggested a neurological or orthopedic evaluation, and ordered an MRI of his lower back.  He also prescribed a pain medication.

Throughout the rest of 2011, Morris continued working as a laborer and would present to the emergency room and the primary care clinic.  He complained of back pain, other pains, and illnesses.  He was prescribed narcotic painkillers, non-narcotic pain medications, and antibiotics. Because of his work schedule, Morris had difficulty scheduling the MRI of his lower back.

On January 7, 2012, Morris received an MRI of his lower back.  The MRI showed evidence of multilevel degenerative disc disease.  It also showed spinal canal stenosis, nerve root impingement, bilateral pars defect, and anterolisthesis.

More specifically, the MRI findings revealed transitional lumbosacral vertebral anatomy, nonspecific straightening of the lumbosacral spine, grade 1 retrolisthesis of L3 on L4, L4 on L5, and grade 1 anterolisthesis of L5 on S1.  There were bilateral L5 pars interarticularis defects, a T2/STIR hyperintense signal within the L5 inferior endplate and S1 superior endplate with corresponding T1 hypointense signal, consistent with Modic type 1 degenerative changes.  Bone marrow was otherwise unremarkable.  There was a mild anterior wedge compression deformity of T12 vertebral body, chronic in appearance, with the vertebral body heights otherwise well-preserved.  There was disc desiccation of T11-T12, L4-L5 and L5-S1.  Multilevel Schmorl's nodes were noted as well as intervertebral disc height loss at L4-L5, L5-S1, T12-L1, and T11-T12.  The spinal cord was normal in signal intensity without extrinsic or intrinsic lesions.  There was a posterior disc osteophyte complex at T11-T12 which appeared to indent the spinal cord causing moderate spinal canal stenosis with ventral CSF effacement and near dorsal CSF effacement.  At L2-L3, there was a mild diffuse disc bulge and mild bilateral facet joint hypertrophy.  At L3-L4, there was minimal grade 1 retrolisthesis with intervertebral disc uncovering and mild neuroforaminal stenosis bilaterally.  At L4-L5, there was central disc extrusion migrating caudally with disc uncovering secondary to grade 1 retrolisthesis of L4 on L5, causing mild spinal canal stenosis.  There was a ventral effacement of the bilateral subarticular recesses, causing probable impingement of the bilateral nerve roots and bilateral facet joint hypertrophy.  At L5-S1, there was a bilateral pars defect, resulting in grade 1 anterolisthesis of L5 on S1 with uncovering of the intervertebral disc without significant spinal canal stenosis, but with severe bilateral neuroforaminal stenosis.  The facet joints and ligaments were unremarkable.

After receiving the MRI, on January 9, 2012, Morris returned to the primary care center where he was diagnosed with spondylolisthesis, spinal stenosis, and herniated intervertebral disc.

5

Because of the findings from the MRI, Morris was referred to see a neurologist within two weeks. He also was to return to the primary care center for follow-up in three months.  It was noted that Morris had violated his pain contract with the clinic when an October 2011 urine test revealed use of barbiturates.  Morris was ordered to have another urine drug screen test and was prescribed only one week of narcotic painkillers.

Morris began presenting to the IU Methodist Hospital ("IU Methodist") emergency room in February 2012 for the next four months, complaining of back pain and other ailments.  He received prescriptions for narcotic painkillers and other pain medications as well as antibiotics.

On April 15, 2012, Morris returned to the Wishard emergency room, complaining of pain, and he was discharged with a prescription for narcotic painkillers.  Three days later, on April 18, 2012, he returned to the IU Methodist emergency room, complaining of pain, and he was discharged with a prescription for narcotic painkillers.

During an April 26, 2012 visit to the IU Methodist emergency room, Morris acknowledged missing an appointment with the neurologist because he had been incarcerated, but he explained he had an appointment scheduled in July.  He also explained that he would miss an upcoming appointment at the primary care clinic because of lack of transportation.  He also admitted that his lack of honesty was causing himself more problems.  Morris continued presenting to the IU Methodist emergency room through June 2012.

On June 13, 2012, Morris presented to the IU Methodist emergency room for pain and was discharged with a prescription for narcotic painkillers.  That same day, June 13, 2012, Morris presented to the Wishard emergency room for pain and was discharged with a prescription for narcotic painkillers.

As part of the disability application process, Morris underwent a physical consultative examination on June 29, 2012. Andrew Sonderman, M.D. ("Dr. Sonderman") performed the examination. Morris reported an ability to walk and stand for thirty minutes before needing to rest with an ability to walk and stand for a total of three hours in an eight hour time frame. He reported being able to sit for two hours at a time for a total of six hours in an eight hour time frame. He asserted that he could climb thirty stairs and lift twenty-five pounds with each arm. On examination, Morris displayed normal gait and was able to heel/toe walk without difficultly. He also was able to perform a full squat maneuver without difficulty. He was neurologically intact with full strength, normal sensation, and symmetric reflexes. There was no evidence of muscle atrophy. Morris did have decreased range of motion in his lumbar spine, and a straight leg raising test was positive on the left and negative on the right in the supine position. Upon completion of the examination, Dr. Sonderman noted Morris's complaints of back pain and depression but did not give an opinion on functional limitations.

On August 1, 2012, Morris called the Wishard primary care center regarding his back pain. He explained that he missed his July 30, 2012 appointment with the neurologist because his Wishard financial assistance benefits had expired. However, the nurse noted that his benefits expired on June 13, 2012, and Morris had also missed earlier appointments with the neurologist in February and March before the expiration of benefits. Morris reported having constant pain and requested a stronger painkiller. The nurse explained that she would have to talk with the doctor. In October and December 2012, Morris was seen in the Wishard emergency room for back and tooth pain and was discharged with a prescription for narcotic painkillers.

Regarding Morris's mental health impairments, Morris was referred by the primary care clinic in August 2011 to receive treatment at Midtown. He began receiving outpatient treatment

7

at Midtown in October 2011.   He was diagnosed with polysubstance dependence, nicotine dependence, and depression.   His treatment plan was to meet with a clinician about three times a month for one to two hours, and he was prescribed medicine for depression and insomnia.   He also was to receive addictions treatment at another facility.   In the Midtown treatment notes, Morris was reported to experience an inability to sleep, guilt and grief, restlessness, racing thoughts, crying spells, stress, irritability, anger outbursts, and short term memory issues.   He reported his history of illegal drug use, prescription abuse, and legal troubles.   Morris attended a few individual therapy appointments and missed other individual therapy appointments.   Midtown staff attempted to call Morris and sent letters to him regarding his missed appointments and his intent to continue treatment.   This time period coincided with another of Morris's terms in jail.   Because of his missed appointments and failure to respond to Midtown, Morris was formally discharged from mental health treatment at Midtown in April 2012.

As part of the disability application process, Morris underwent a psychological consultative examination on June 30, 2012.   Jared Outcalt, Ph.D. ("Dr. Outcalt") performed the examination. Morris reported being stressed out all the time, having difficulty sleeping, and feeling depressed, anxious, and hopeless.   He reported being without motivation, preferring to not be around others, and having a poor appetite.   He reported weight loss, very low energy, poor self-esteem, thoughts of worthlessness, and ongoing worry most of the day.   He discussed his history of mental health treatment but that it was interrupted because of a recent incarceration.   He explained his history of alcohol abuse, illegal drug use, and prescription drug abuse.   He also discussed legal troubles from these activities.   He claimed that these challenges were in the past and that he only drank six beers on occasion about once a month.   On examination, Morris was cooperative, friendly, and attentive. He had consistent and appropriate eye contact.   His speech and thoughts were unremarkable.   His

mood was anxious at times but good.  His affect was normal and full.  He was oriented to time, person, place, and situation.  His appearance was clean and neat.  His cognition was normal.  Upon completion of the examination, Dr. Outcalt diagnosed Morris with depression, anxiety, and polysubstance dependence in sustained full remission. He assessed Morris as having a global assessment of functioning score of 55.  Dr. Outcalt also noted that Morris presented as being able to learn, remember, and comprehend simple instructions with the ability to attend to simple tasks and respond appropriately and timely.  He opined that Morris can interact appropriately with others and can handle routine changes in work.

## II.   <u>DISABILITY AND STANDARD OF REVIEW</u>

Under the Act, a claimant may be entitled to SSI only after he establishes that he is disabled. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience.  42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled.  At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors.  20 C.F.R. § 416.920(a)(4)(i).  At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, he is not disabled.  20 C.F.R. § 416.920(a)(4)(ii).  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  At

step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled.  20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the fourth and fifth steps.  Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations."  *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p).  At step four, if the claimant is able to perform his past relevant work, he is not disabled.  20 C.F.R. § 416.920(a)(4)(iv).  At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given his RFC and considering his age, education, and past work experience.  20 C.F.R. § 404.1520(a)(4)(v).  The claimant is not disabled if he can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred.  *Dixon v. Massanari*, 270 F.3d

1171, 1176 (7th Cir. 2001).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ.  *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).  While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome."  *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be based upon consideration of all the relevant evidence."  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability.  *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III.    THE ALJ'S DECISION

The ALJ conducted the five step disability analysis, and at step one, the ALJ found that Morris had not engaged in substantial gainful activity since January 27, 2012, the date of his application for SSI.  At step two, the ALJ found that Morris had the following severe impairments: degenerative disc disease, depression, and polysubstance abuse.  At step three, the ALJ concluded that Morris did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined that Morris has an RFC to "perform less than the full range of light work" with the following limitations: "no climbing of ladders, ropes, and scaffolds, and only

11

occasional climbing of ramps or stairs; only occasional balancing, stooping, kneeling, crouching, and crawling; and the work must be unskilled in nature." (Filing No. 12-2 at 20–21.)

At step four, the ALJ determined that Morris was unable to perform his past work as a stocker and laborer because the demands of his past relevant work exceeded his RFC. At step five, the ALJ determined that Morris is not disabled because there are jobs that exist in significant numbers in the national economy that Morris could perform, considering his age, education, past work experience, and RFC. Therefore, the ALJ denied Morris's application for SSI because he is not disabled.

## IV.   DISCUSSION

In his request for judicial review, Morris argues that the ALJ's decision is erroneous on two bases: 1) the ALJ erroneously found there is no evidence of the required elements of Listing 1.04 for disorders of the spine, and 2) the ALJ failed to build an accurate and logical bridge between the evidence and conclusions regarding Morris's credibility. These contentions will be addressed in turn.

### A.   The ALJ's Medical Equivalence Determination for Listing 1.04

Morris first asserts that the ALJ's decision should be reversed because the ALJ failed at Step 3 to acknowledge and consider certain evidence that supported a finding that his back impairment met or medically equaled Listing 1.04 for disorders of the spine. Morris contends the ALJ did not evaluate any of the evidence that was favorable to his back impairment, which would meet the criteria for Listing 1.04. He explains:

> The ALJ, in discussing Morris' condition under Listing 1.04, stated that "there is **no evidence** of nerve root compression, spinal arachnoiditis, lumbar spinal stenosis . . . neuroanatomic distribution of pain . . . or compromise of a nerve root. No medical source of record has appreciated muscle atrophy, documented weakness in the claimant's upper or lower extremities, or opined that the claimant medically required an assistive device to ambulate." [Dkt. 12-2 at p.19, R. 18].

(Filing No. 16 at 11.) (Emphasis in original.)  Morris then points to the findings from his January 7, 2012 MRI and asserts that clearly there was evidence of nerve root compression, spinal stenosis, and distribution of pain.  Indeed, the MRI findings indicate spinal canal stenosis, indentation on the spinal cord, and nerve root impingement.  Further, at his appointment at the primary care clinic on January 9, 2012, Morris was diagnosed with spondylolisthesis, spinal stenosis, and herniated intervertebral disc.

Morris's medical records note subjective complaints from Morris to health care providers about lower back pain that radiated down into his left leg.  One note indicates that he ambulated with a limp.  Other medical records indicate that he had decreased range of motion.  He had a positive straight leg raise test on the left and negative on the right when in the supine position. In consideration of the MRI findings and the other medical records, Morris argues that the ALJ's decision should be reversed and remanded for a more thorough analysis of the evidence at Step 3.

In response, the Commissioner explains that in order for Morris's back impairment to meet or medically equal Listing 1.04, there would have to be more than a diagnosis of spinal stenosis or degenerative disc disease with accompanying nerve root compression.  Morris had the burden at Step 3 to establish all the criteria of Listing 1.04 to be found *per se* disabled.  *See* 20 C.F.R. § 404.1525(c)(3).  The Commissioner asserts that Morris failed to show any nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, and motor loss accompanied by sensory or reflex loss.  Therefore, the ALJ's decision that Morris's back impairment did not meet or medically equal Listing 1.04 was correct.

The criteria for Listing 1.04 are found at 20 C.F.R. Part 404, Subpart P, Appendix 1.  In order for a back impairment to meet or medically equal Listing 1.04, a claimant must show:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
or
B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
or
C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

If the criteria of the introductory paragraph are met—a disorder of the spine resulting in compromise of a nerve root or the spinal cord—as well as all the criteria in subparagraphs A, B, or C, then a back impairment meets or medically equals Listing 1.04.

To assist in its review of the ALJ's Listing 1.04 determination, the Court quotes the ALJ's full discussion of Listing 1.04 in its entirety.

I considered the claimant's degenerative disc disease of the lumbar spine using the criteria of Listing 1.04 (Disorders of the Spine), which requires medical evidence of a disorder of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord with evidence of nerve root compression[1], spinal

---

[1] Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) (see Listing 1.04(A)).

arachnoiditis[2], or lumbar spinal stenosis[3] resulting in an inability to ambulate effectively.[4] In this case, there is no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in an inability to ambulate effectively. The claimant has degenerative disc disease of the lumbar spine with limitation of motion and tenderness, but there is no evidence of neuro-anatomic distribution of pain, nerve root compression, or compromise of a nerve root. No medical source of record has appreciated muscle atrophy, documented weakness in the claimant's upper or lower extremities, or opined that the claimant medically required an assistive device to ambulate. Thus, I find that the claimant does not meet, or medically equal, Listing 1.04.

(Filing No. 12-2 at 18–19.)  Later in her decision, the ALJ discussed her review of the MRI and the other medical records.  She noted the spinal stenosis, neuroforaminal stenosis, degenerative disc disease, and nerve root impingement that appeared on the MRI.  She also discussed the many medical records that reported the pain in Morris's back that intermittently radiated into his left leg and noted records of a flat-footed gait as well as other additional records indicating a normal gait. She noted his ability to walk without pain and mentioned his ability on multiple occasions to heel/toe walk without problems.  The ALJ discussed medical records that indicated Morris's reflexes and strength were intact and that he retained full strength.  The ALJ also pointed to evidence indicating there was no muscle atrophy.

Morris's selection of partially quoted language from the ALJ's decision makes it appear that the ALJ saw no evidence of the overarching criteria for Listing 1.04 when such evidence readily appears in the medical records.  When viewed in full context and with all the language of

---

[2] Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours (Listing 1.04(B)).

[3] Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness (Listing 1.04(C)).

[4] An "inability to ambulate effectively" means an extreme limitation of the ability to walk.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held device(s) that limits the functioning of both upper extremities (Listing 1.00(B)(2)(b), Listing of Impairments, Subpart P, Appendix 1, Regulations No. 4, emphasis added).

the Listing 1.04 discussion, it becomes apparent that the ALJ was explaining that there was no evidence supporting the subparagraph criteria of accompanying characteristics to meet the Listing, such as an inability to ambulate effectively or muscle atrophy or weakness.  While the ALJ may have poorly worded a portion of her decision by stating, "there is no evidence of neuro-anatomic distribution of pain, nerve root compression, or compromise of a nerve root," (Filing No. 12-2 at 19), this language was immediately between the ALJ's explanation of a lack of evidence showing an inability to ambulate effectively and no evidence of any muscle atrophy, weakness, or the necessity of an assistive device to ambulate.  Furthermore, the ALJ did acknowledge and discuss evidence of nerve root impingement and spinal stenosis throughout her decision, thus indicating that she was aware of and considered that evidence.

The record supports the ALJ's decision that there was insufficient evidence to establish the criteria and sub-criteria for Listings 1.04(A), (B), and (C).  There was no evidence of spinal arachnoiditis to meet Listing 1.04(B).  There was no evidence of an inability to ambulate effectively to meet Listing 1.04(C).  The ALJ considered the evidence regarding neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and positive straight-leg raising test (sitting and supine), and she determined that the evidence did not support a finding that Morris met or medically equaled Listing 1.04(A).

The Court does not reweigh the evidence when reviewing the ALJ's disability determination.  The ALJ relied on and weighed the medical records provided by Morris's health care providers, including the MRI of his lower back.  In this case, the Court determines that the ALJ properly considered all the relevant evidence, and the ALJ's Step 3 analysis and decision was supported by substantial evidence.

**B.**      **The ALJ's Credibility Determination of Morris**

Next, Morris asserts that, according to SSR 96-7p, an ALJ must address the following seven factors when determining the credibility of a claimant:  activities of daily living; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of medication; treatment, other than medication; any measures other than treatment used to relieve pain or other symptoms; and any other factors concerning the functional limitations and restrictions due to pain or other symptoms. Morris then argues that, although the ALJ discussed these factors in the decision, she made erroneous conclusions within the discussion of the factors.

Because the ALJ is in the best position to observe witnesses, an ALJ's credibility determination will not be upset on judicial review if it is supported by some record evidence and is not "patently wrong." *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir. 2012); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). *See also Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) ("[i]t is only when the ALJ's determination lacks any explanation or support that we will declare it to be 'patently wrong'").  However, the ALJ must articulate specific reasons to support the credibility finding.  *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003).  In this regard, while an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible.  *Id*.

In response to Morris's credibility argument, the Commissioner explains that the ALJ reasonably discounted Morris's subjective reports about his ability to work, and the ALJ's decision to limit him to light work with additional limitations instead of medium work as suggested by the state agency experts indicates that the ALJ gave some credit to Morris's testimony.   The

Commissioner explains that the ALJ found discrepancies between Morris's testimony and the medical record, and discrepancies between a claimant's allegations and the medical record are by themselves probative of exaggeration and, thus, good cause for an adverse credibility finding.  *See Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010).

When considering Morris's credibility and the severity of his symptoms and their effect on his ability to work, the ALJ relied on Morris's own testimony and reports, a report from Morris's uncle, and the reports and records from health care providers.  The ALJ discussed evidence which indicated that Morris retained the ability to sweep, mop, mow the lawn, take out the garbage, complete household chores, and take care of his personal hygiene.  The evidence also indicated that he could perform a full squat maneuver without trouble, he retained full strength and normal sensation, and he had symmetric reflexes.  The ALJ also discussed the numerous times that Morris asserted to medical providers that he was no longer drinking alcohol or abusing drugs, which contradicted statements that he made to other medical providers. The ALJ found Morris to be credible regarding his testimony that he was experiencing back pain, but determined his greater problems were attributable to his substance abuse.  All of these findings are supported by record evidence.

The ALJ discussed giving little weight to the expert opinions of the state agency consultants because their opinions did not account for Morris's subjective complaints of pain and his substance abuse.  The opinions from these experts would have given Morris less restrictive limitations than what the ALJ ultimately imposed.  This indicates that the ALJ did not fully disregard Morris's testimony or find him to be completely not credible.  However, the ALJ did discount his credibility to some degree, and doing so was supported by the evidence.

The ALJ considered the factors presented in SSR 96-7p when determining Morris's credibility. Morris does not agree with the weight and consideration the ALJ gave to the evidence when reviewing these factors. However, the record as a whole as well as specific notes in the record support the ALJ's credibility determination. The Court cannot say that the ALJ's credibility determination was patently wrong.

## V.   <u>CONCLUSION</u>

For the reasons set forth above, the final decision of the Commissioner is **AFFIRMED**. Morris's appeal is **DISMISSED**.

**SO ORDERED.**

Date: 3/17/2016

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov